# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MONSANTO COMPANY AND
THE NUTRASWEET COMPANY,

        Plaintiffs,

        v.                                          Case No. C-1-99-371

BROTHERS TRADING COMPANY, INC.
D/B/A VICTORY WHOLESALE
GROCERS, et al.,

        Defendants.

## ORDER

Plaintiffs Monsanto Company (Monsanto) and the NutraSweet Company (NutraSweet) bring this trademark infringement action against defendants Brothers Trading Company, Inc. d/b/a Victory Wholesale Grocers (Victory), Brothers Trading Co., Inc. (Brothers), Grapevine Trading Co. (Grapevine) and SK Tors, Inc. (SK Tors). Victory brings third-party claims against third-party defendants Trio International Trading, Inc. (Trio), Mark Siegel, and Intransit Services, Inc.

Plaintiffs seek a permanent injunction prohibiting defendants' sale and distribution of alleged counterfeit Equal brand of tabletop sweetener (Equal) and ordering the return of the product to plaintiffs. Plaintiffs also seek a permanent injunction against defendants' disassembly of the alleged counterfeit Equal packaging and the repackaging of Equal packets into other

1

packaging in alleged violation of plaintiffs' trademark and contractual rights. Plaintiffs

summarize the legal issues before the Court as issues concerning "the likelihood of confusion as

to the source of the counterfeit Equal product, the likelihood of confusion as to the source of the

Equal packets as repackaged by defendants into other packaging, the impairment and/or

destruction of plaintiffs' quality control standards, and the infringement of plaintiffs'

copyrights." In addition to injunctive relief, plaintiffs seek monetary damages under various

federal and state laws.

## I. Plaintiffs' claims

Plaintiffs filed the original complaint in this action on May 20, 1999, against Victory

Wholesale Grocers (doc. 1). Plaintiffs thereafter amended the complaint and then filed a second

amended complaint on April 4, 2003 (doc. 111). In the second amended complaint, plaintiffs

added as defendants Brothers, Grapevine, and SK Tors and renamed defendant Victory

Wholesale Grocers as Brothers Trading Co., Inc. d/b/a Victory Wholesale Grocers.

Plaintiffs make the following factual allegations in the second amended complaint:

NutraSweet, a wholly-owned subsidiary of Monsanto, is the owner of the trademarks "Equal"

and "NutraSweet." Monsanto has devoted substantial resources to the advertising and promotion

of Equal. The Equal product has come to be known by the purchasing public throughout the

United States as a sweetener of the highest quality, so that the Equal and NutraSweet trademarks,

the Equal trade dress, and the goodwill associated with them are of inestimable value to

plaintiffs. Sweeteners bearing the Equal and NutraSweet trademarks are recognized by the public

and in the trade as originating from a single source.

The retail boxes at issue contain material wholly original with NutraSweet (i.e., a

2

"Strawberry Design" consisting of photographs, text and graphics) that is copyrightable subject matter under the laws of the United States for which NutraSweet has obtained Certificates of Registration from the Register of Copyrights. Plaintiffs are the sole proprietor of all right, title and interest in and to the copyright in the Strawberry Design and have produced and distributed the Strawberry Design in strict conformity with the provisions of the Copyright Act of 1976 and all other laws governing copyright.

Monsanto sells its Equal product to the retail and food service industries. Monsanto uses different packaging for its food service (institutional) customers than it does for its  retail customers. Monsanto sells bulk quantities of Equal packets in its "food service use only"/institutional cartons, which contain either 1000 or 2000 packets. The food service packaging expressly states "Not for retail sale." Each individual packet of Equal contained in the food service carton states "We Proudly Serve" on the front of the packet and "for restaurant use" on the back.  Monsanto also sells retail blue boxes of Equal that contain 50, 100, 200, 500 or 700 packets.

In or about the fall of 1998, Monsanto learned through quality assurance audits that Equal food service packets were being sold in counterfeit retail packaging (the counterfeit Equal product). The counterfeit Equal product consists of counterfeit blue retail boxes bearing the Strawberry Design, which were unlawfully and without plaintiffs' authorization manufactured and packaged with individual packets of Equal sweetener that were originally sold by plaintiffs in bulk in cartons for institutional use only. The counterfeit Equal product differs from the genuine product in several respects. Also, the counterfeit retail boxes contain false information, including bogus lot codes and representations that the boxes were printed in the United States.

As a result of the discovery of the counterfeit Equal product, Monsanto sent out letters to retailers warning about the presence of counterfeit Equal product in the marketplace. Monsanto tracked some of the counterfeit product back to distributors, including Victory, who had purchased the product from Mark Siegel of Trio.

The counterfeiting operation, which involved breaking down Equal product sold in food service packaging and repackaging the Equal product into counterfeit retail boxes, takes advantage of the fact that the price charged by Monsanto for food service packaged product is significantly lower than the price charged for retail packaged product. Upon information and belief, Victory knowingly purchased, distributed and sold the counterfeit Equal product.

The counterfeit Equal product violates the quality control procedures employed by plaintiffs and violates plaintiffs' guidelines with respect to approval for the manufacture of component parts and the approval of contract manufacturers. Plaintiffs cannot assure the quality of the Equal product as contained in the counterfeit packaging. The counterfeit Equal boxes expressly misstate that the product is distributed by the NutraSweet Company and do not reveal in any manner that the contents were distributed by an entity other than the NutraSweet Company. Because of the repackaging, plaintiffs cannot assure the accuracy of the number of packets represented to be contained in each box. Furthermore, the colors on the counterfeit boxes are washed out, thus reflecting poorly on the quality of plaintiffs' product.

On March 26, 1999, plaintiffs contacted Victory and demanded that Victory hold and segregate all counterfeit Equal product in its possession and make arrangements to return the counterfeit Equal product to plaintiffs. Additional correspondence ensued between plaintiffs and Victory, with Victory representing to plaintiffs that it was identifying and separating the

4

counterfeit product. Victory subsequently advised plaintiffs that it had removed all the Equal packets from the counterfeit boxes and repackaged them in "generic boxes." Upon information and belief, the repackaged Equal product causes likelihood of confusion as to the source of the product as well as the impairment or destruction of plaintiffs' quality control standards.

The distribution of the counterfeit Equal product causes irreparable harm to plaintiffs. As part of its quality control procedure, plaintiffs imprint a "Lot Code" on the bottom of each retail box, which enables plaintiffs to track the manufacture and packing of the product. The placement of bogus Lot Codes on the counterfeit boxes subverts plaintiffs' product tracking procedures, which are designed to expedite recalls, and plaintiffs' quality control procedures, and it frustrates Monsanto's ability to maintain accurate records of interstate shipments of its food products. The distribution of the counterfeit Equal and the repackaged product, which does not sufficiently identify the product as being repackaged by name and address of the repackaging entity, will cause substantial and irreparable damage to Monsanto and NutraSweet in at least the following respects:

(1) Victory's infringement of plaintiffs' registered trademarks for Equal and NutraSweet and the Strawberry Design copyright misleads and confuses and will mislead and confuse consumers as to the origin and source of the product;

(2) The distribution and sale of the counterfeit Equal product and the repackaged Equal product damages the invaluable reputation and goodwill that plaintiffs have built for their NutraSweet and Equal trademarks and the Strawberry Design copyrights;

(3) The infringement by Victory of plaintiffs' trademarks dilutes the distinctive quality of the trademarks;

5

(4) Plaintiffs' rights and obligations and the public welfare are impacted by Victory's violation of Ohio Rev. Code Chapter 3715, and plaintiffs will be unable to comply with their legal obligations regarding the packaging, repackaging, distribution, and sealing and resealing of food products that are found in 21 C.F.R. Part 110, sub-parts A, B, C, E and G; 21 C.F.R. part 7, sub-part C, § 7.40; 21 U.S.C. §§ 371 and 374; and 42 U.S.C. § 264;

(5) When the consumer purchases the counterfeit Equal product and the repackaged Equal product, he will be misled into believing that he is purchasing a product that has undergone plaintiffs' strict quality assurance guidelines, and the repackaging and rehandling of the Equal product exposes the consumer to increased hazards of defective machinery or negligent handling.

Based on these factual allegations, plaintiffs bring the following claims:

(1) The defendants used in commerce, without plaintiffs' consent, either a reproduction, counterfeit, copy or colorable imitation of the Equal and NutraSweet registered marks and Equal trade dress in connection with the sale, offering for sale, distribution or advertising of counterfeit Equal product or in connection with such use, which is likely to cause confusion, or to cause mistake or to deceive, in violation of 15 U.S.C. § 1114(1)(a);

(2) Defendants, in connection with Equal products, used in commerce a word, term, name, symbol or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was likely to cause confusion or mistake, or to deceive as to the approval of defendants' goods by plaintiffs, in violation of 15 U.S.C. § 1125(a)(1)(A);

(3)  Defendants, in connection with Equal products, used in commerce a work, term, name, symbol or device, or any combination thereof, or a false designation of origin, false or misleading description of fact or false or misleading representation of fact, which, in commercial advertising or promotion, misrepresented the nature, characteristics, qualities or geographical origin of the Equal product, in violation of 15 U.S.C. § 1125(a)(1)(B);

(4) Defendants, in connection with the sale of counterfeit Equal product, have infringed and will continue to infringe plaintiffs' copyright in and relating to the Strawberry Design by distributing, selling, transferring and placing upon the market products which are direct copies of plaintiffs' copyrighted Strawberry Design, in violation of 17 U.S.C. § 101, et seq.;

(5) Defendants have violated Ohio common law by unfairly competing with plaintiffs by knowingly selling and distributing the counterfeit Equal product and the repackaged Equal product;

(6) Defendants have unjustly enriched themselves at plaintiffs' expense and plaintiffs have been damaged by the sale and distribution of the counterfeit Equal product and the repackaged Equal product, and equity and good conscience dictate that defendants not be permitted to retain the profits from their sale and distribution of the counterfeit Equal product and the repackaged Equal product;

(7) Victory, in bad faith, breached its agreement with plaintiffs as set forth in the numerous letters between Victory and plaintiffs by disassembling the counterfeit Equal product and unlawfully repackaging the Equal packets;

7

(8) Victory committed fraud by concealing the fact that it intended to disassemble the counterfeit Equal product and unlawfully repackage the Equal packets and by making false representations to plaintiffs, which induced plaintiffs to forego seeking immediate judicial restraint with respect to Victory's possession of the counterfeit Equal product and remedies for the violations.

Plaintiffs seek the following relief for the alleged violations:

(1) A preliminary and permanent injunction pursuant to Fed. R. Civ. P. 65, the Lanham Act and Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116, and the Copyright Act, 17 U.S.C. § 101 et seq., enjoining defendants and all persons acting on behalf of or in concert with defendants from possessing, receiving, distributing, advertising, promoting, transferring, offering for sale or otherwise disposing of in any manner, holding for sale, or selling any counterfeit Equal product; from emptying the contents of the counterfeit Equal product and/or in any way tampering with the counterfeit Equal product; to the extent defendants have emptied the contents of the counterfeit Equal product, from repackaging, distributing, offering for sale, or otherwise disposing in any manner of the Equal packets and from destroying, distributing, offering for sale or otherwise disposing of the empty counterfeit boxes; to the extent defendant has already repackaged the Equal packets into any other form of packaging, from distributing, advertising, promoting, transferring, offering for sale or selling any of the repackaged Equal product; from infringing the Equal and/or NutraSweet trademarks and the Strawberry Design copyright; from otherwise unfairly competing with plaintiffs; from affixing or using in connection with the same goods any false representation or any representation tending to describe or falsely represent such goods as being those of plaintiffs and from offering such goods in commerce; from using any

8

trademark, trade name or trade dress in connection with the sale of any goods which may be calculated to falsely represent such goods as being connected with, approved or sponsored by plaintiffs; and from destroying, altering, disposing of, moving, removing, concealing, tampering with, or in any manner secreting certain records;

(2) An order directing that all infringing material be ordered seized, impounded and destroyed;

(3) An order awarding plaintiffs treble damages and costs, expenses and attorneys fees pursuant to 15 U.S.C. § 1117 and damages and costs, expenses and attorney fees and/or statutory damages pursuant to 17 U.S.C. § 101, et seq.; and

(4) An order awarding damages, including punitive damages, for unfair competition, unjust enrichment, breach of contract, and fraud.

## II. Procedural history

On May 20, 1999, plaintiffs filed a motion for temporary restraining order and preliminary injunction, to expedite discovery, and for writ of replevin (doc. 3). Plaintiffs summarize their action as seeking "a permanent injunction against [Victory's] sale and distribution of counterfeit Equal product and return of said counterfeit product to plaintiffs." Plaintiffs claim that the "counterfeit Equal product is comprised of counterfeit blue retail boxes which were unlawfully and without plaintiffs' authorization manufactured and packaged with individual packets of Equal sweetener that was originally sold by plaintiffs in bulk in cartons for food service/institutional use only." Plaintiffs contend that Victory has disassembled the counterfeit Equal product and repackaged the packets into "generic boxes" (the repackaged Equal product).

9

By Order dated June 10, 1999, the Court found the motion for temporary restraining order and motion to expedite discovery to be moot (doc. 9). On March 23, 2002, the Court ordered the motion for preliminary injunction consolidated with trial on the merits (doc. 256). On July 15, 2002, the Court issued an Order allowing Merisant Company (Merisant) to be added as a plaintiff in the litigation (doc. 277).

The Court held a hearing on the preliminary injunction motion/liability issues over a period of ten days commencing on October 8, 2002, and ending on January 29, 2003. Based on the evidence presented at the hearing and the parties' submissions, the Court sets forth herein its Findings of Fact and Conclusions of Law. To the extent any of the following Findings of Fact contain any conclusions of law, they shall to that extent be deemed Conclusions of Law. To the extent any of the following Conclusions of Law contain any findings of fact, they shall to that extent be deemed Findings of Fact.

### III. Findings of Fact

1. Plaintiff Merisant is a corporation organized under the laws of the State of Delaware with its principal place of business in Clayton, Missouri.

2. Plaintiff Monsanto Company was at all times germane to the allegations herein a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri.

3. Plaintiff NutraSweet at all relevant times has been a corporation organized under the laws of the State of Delaware with its principal place of business in Deerfield, Illinois.

10

4.   Defendant Brothers Trading Co., Inc. d/b/a Victory Wholesale Grocers is an Ohio corporation with its principal place of business at 400 Victory Drive, Springboro, Ohio. Victory Wholesale Grocers does not have a separate existence and is merely a d/b/a for Brothers.

5.   Victory Wholesale Grocers is one of the three largest unauthorized grocery wholesalers in the country. It  is also sometimes referred to as a diverter. Victory Wholesale Grocers is in the business of purchasing grocery products from suppliers other than the manufacturer and selling the products to other entities in the grocery business.

6.   Defendant Brothers is an Ohio corporation with its principal place of business at 400 Victory Drive, Springboro, Ohio.

7.   Defendant Grapevine is a wholly-owned subsidiary of Brothers. Grapevine is a Florida corporation which at all relevant times conducted business at 400 Victory Drive, Springboro, Ohio. Grapevine does not have any employees. All persons assigned to work for Grapevine are carried on Brothers' payroll. Grapevine does not file a separate corporate tax return but its return is consolidated in Brothers' return.

8.   Brothers' accounting department does bookkeeping for Brothers and Grapevine.

9.   Brothers, Victory Wholesale Grocers, and Grapevine did not generate or maintain internal records demonstrating sales and/or transfers between each other with respect to the Equal product at issue.[1]

---

[1] Brothers, Victory Wholesale Grocers, and Grapevine are collectively referred to hereinafter as "Victory."

11

10. Defendant SK Tors, Inc. is a Florida corporation with its principal place of business in Florida.

11. Steven Kinlaw is the sole owner, sole employee, and president of SK Tors. He is paid sales commissions through SK Tors. Kinlaw never had independent buying authority for Victory.

12. SK Tors maintains no formal corporate minutes and no corporate books and records other than tax returns.

13. Non-party HCG, Inc. a/k/a Zack Pack (Zack Pack) is an Ohio corporation whose business address is listed with the Ohio Secretary of State as 400 Victory Drive, Springboro, Ohio, which is also Victory's address.

14. Individuals who work at Zack Pack are employees of Victory and receive their salaries from Victory.

15. At the direction of Victory, Zack Pack repackages products that Victory has purchased.

16. At all relevant times, Monsanto was a manufacturer and distributor of consumer products sold under various registered trademarks owned by its wholly-owned subsidiary, NutraSweet. Among these trademarks is Equal, which is a well-known and widely sold sweetener.

17. NutraSweet was the owner of the trademark "Equal," Registration No. 1,158,683, registered on June 30, 1981, and Equal Registration No. 1,318,800, registered on February 12, 1985. NutraSweet is the owner of another "Equal" trademark, Registration No. 2,012,219, registered on October 29, 1996.

18.　NutraSweet was the owner of the trademark "Nutra-Sweet," Registration No. 1,262,746, registered on January 3, 1984; "NutraSweet," Registration No. 1,358,678, registered on September 10, 1985; and "NutraSweet," Registration No. 1,336,188, registered on May 21, 1985.

19.　Over two years ago, Monsanto and NutraSweet transferred certain ownership rights with respect to Equal to Merisant.

20.　Monsanto has devoted resources to the advertising and promotion of Equal.

21.　Plaintiffs have engaged in, and continue to engage in, interstate activities designed to promote the Equal product and the business and goodwill associated with their trademarks and to expand the use of their trademarks, trade dress, logos and property in the State of Ohio and throughout the United States.

22.　At all relevant times herein, Monsanto sold its Equal product to the retail and food service industries.

23.　Monsanto utilized different packaging for its food service (institutional) customers and retail consumers. Monsanto sold bulk quantities of Equal packets in its "food service use only"/institutional cartons, which contain 2000 packets. The food service packaging expressly states "Not for retail sale." Each individual packet of Equal contained in the food service carton features a coffee cup/tea cup and states "We Proudly Serve" on the front of the packet and "For restaurant use" on the back.

24.　Monsanto also sold Equal in blue retail cartons containing 50, 100, 200, 500 or 700 packets. The individual Equal packets sold in the retail cartons are blue and feature the copyrighted Strawberry Design.

13

25. Monsanto performed visual inspections of the Equal retail cartons and checked the color, wording, and graphics on the cartons. Monsanto used calibrated scales to verify the product weight.

26. The blue retail cartons serve several important functions, including identifying the lot code through which the date, year, and location of manufacturer are ascertainable; listing the number of packets contained in the box; and serving as containers for the Equal retail packets.

27. The retail Equal cartons and institutional boxes do not contain expiration dates.

28. Equal usually leaves plaintiffs' ownership within one year of the date of its production. Equal product that is more than three years old can turn tan or brown in the presence of heat or humidity.

29. It is reasonable for a consumer who purchases a retail carton of Equal to expect that the carton has been packaged by Monsanto or under Monsanto's authorization and that the carton contains the stated number of blue retail packets. A consumer also has a reasonable expectation that the contents of the retail carton will not have been handled by a third party between plaintiffs' production and packaging of the product and the consumer's purchase of the product.

30. Individual food service/institutional packets are commonly exposed to the public and conditions in public places such as restaurants, hospitals, nursing homes, offices, fast food restaurants, cafeterias and similar places. Plaintiffs do not have any guidelines for the handling of the packets following their purchase but expect people to use common sense in handling the product.

14

31.     On a per packet basis, Monsanto sold institutional Equal for substantially less than retail Equal. A purchaser of institutional Equal could make a profit by re-creating the retail cartons and the retail shippers and repackaging the Equal packets from the 2000 count institutional shippers into the retail 50 or 100-count cartons and selling them into the retail channels of distribution.

32.     Third-party defendant Trio is known in the grocery industry as a diverter or supplier. Trio purchased 52,520 cases of Equal sweetener that were originally sold by Monsanto in institutional shippers containing 2000 institutional packets each, a total of over 104 million individual sweetener packets. Trio acted in concert with others to create new retail cartons and shippers bearing replicas of the Equal trademark. Trio repackaged the genuine Equal sweetener packets into those cartons and placed the cartons into shippers. Trio and its principal, Mark Siegel, were responsible for coordinating the emptying of Equal packets from the institutional boxes and repackaging the Equal institutional packets into Trio's retail cartons without plaintiffs' authorization.

33.     During the time frame of 1998 through early 1999, Trio sold Equal that it had repackaged in the Trio retail boxes to Victory and SK Tors. Victory and SK Tors made a total of four purchases of Equal packaged in Trio retail boxes. The purchases were made in September, November and December of 1998 and January of 1999. Two other companies, Quality King and Purity, purchased much of the remaining Equal product from Trio.

34.     The four purchases of Equal from Trio by Victory and SK Tors consisted of the following: (1) 3,072 cases of 18 cartons of 100-count Equal at $45.55 per case; (2) 5,680 cases of 12 cartons of 50-count Equal at $16.30 per case and 1174 cases of 18 cartons of 100-count Equal at $45.00 per case; (3) 4,000 cases of 18 cartons of 100-count Equal at $44.25 per case; and (4) 500 cases of 18 cartons of 100-count Equal at $44.25 per case and 3,327 cases of 12 cartons of 50-count Equal at $16.39 per case. These prices were comparable to those paid by defendants to other suppliers for the same product, although more favorable than prices that Victory had paid for the product in the past. Defendants' profit on the Equal product purchased from Trio approximated Victory's normal profits.

35.     Monsanto became aware in October 1998 as a result of an "RQA" (Retail Quality Assurance) field audit that alleged counterfeit repackaged Equal sweetener packets were in the retail market.

36.     Monsanto conducted an RQA audit in December 1998. In January of 1999, Monsanto first learned that the alleged counterfeit product was not part of an earlier counterfeit scheme by another entity which Monsanto had previously uncovered.

37.     By letter dated January 25, 1999, Monsanto advised eleven grocery stores of the existence of the alleged counterfeit Equal product (Exh. 501). During the period of February and March 1999, Monsanto began to approach individual grocery stores that had the Trio cartons in inventory and informed them that the cartons were counterfeit. Monsanto did not demand that the stores remove or stop selling the product.

16

38.     Monsanto determined based on its investigation and inspection of the packets in the Trio
        retail cartons that the individual Equal packets in the cartons were genuine and met
        Monsanto's quality standards.

39.     The notified stores continued to sell the Equal in the Trio retail cartons based on
        Monsanto's assurances that the packets were genuine, met its quality standards, and were
        safe to consume. Monsanto did not know at the time the conditions under which the
        product had been handled.

40.     In April of 1999, Monsanto obtained a second investigative report which indicated that
        several stores in addition to those on the original list had the alleged counterfeit Equal
        product on their shelves. Monsanto determined through its investigation that 5% of the
        Equal product on store shelves consisted of the alleged counterfeit retail cartons of Equal.
        Monsanto did not contact the grocery stores in response to this report. It did not attempt to
        demand or persuade these customers to not continue to carry and sell the alleged
        counterfeit product and instead allowed the product to be sold to consumers. Monsanto
        subsequently suggested to the retailers that they remove the product from their shelves and
        cooperate to discover the source.

41.     Monsanto never issued a recall of the Equal product sold in the Trio retail cartons.

42.     The Trio retail cartons are essentially identical to plaintiffs' genuine Equal cartons. The
        cartons differ in that the colors of the Trio cartons are washed out whereas the colors of
        the genuine cartons are crisp. Also, the Trio cartons do not have a coupon printed on the
        inside as do the genuine cartons.

17

43.   The UPC on the Trio retail cartons of Equal correctly identifies the manufacturer as Monsanto and the contents as Equal sweetener.

44.   Mark Siegel of Trio had initiated contact with Victory about the possibility of Victory purchasing product from Trio. Following the initial contact and prior to the fall of 1998, Victory made five purchases of product other than Equal from Trio. Over the course of the year preceding the first purchase of Equal from Trio, Joseph Hudek, a Victory buyer, had several conversations with Siegel. Both Hudek and Kinlaw of SK Tors found Siegel to be knowledgeable about the grocery industry.

45.   Prior to the transactions at issue herein, Trio was not known to defendants to be a traditional distributor or seller of Equal. Nor was Trio known to defendants to be a regular supplier of Equal to Victory at the time of the first transaction with Trio.

46.   Prior to entering into any transactions with Trio, Victory's credit manager obtained and reviewed a Dun & Bradstreet report on Trio. The report verified Trio's business address and the fact that Trio was incorporated.

47.   Defendants never visited the offices of Trio, never learned how many employees Trio had, and never inquired as to the source of the Equal product purchased from Trio.

48.   Monsanto learned of Victory's acquisition of the Trio Equal product some time after March 16, 1999. Monsanto first advised Victory by letter dated March 26, 1999, of the alleged counterfeit nature of the product.

49.    After Monsanto had placed Victory on notice concerning the Trio retail cartons of Equal packets that Victory had in its possession, there was an exchange of correspondence between counsel for Victory and Monsanto. Monsanto demanded that Victory discontinue its sales of the product and return the product to plaintiffs.

50.    After receiving notice from Monsanto on March 26, 1999, Victory did not thereafter sell any of the Trio retail cartons of Equal.

51.    Acting on information from Monsanto, Victory identified and isolated the Equal product in the Trio retail cartons.

52.    In April and May of 1999, Victory instituted a repackaging operation of the Equal product that it had purchased from Trio. Zack Pack conducted the repackaging operation. The Trio retail cartons were opened, the individual packets were emptied from the cartons, and the loose Equal packets were placed into 2000-count corrugated cardboard boxes.

53.    The boxes into which Victory repackaged the Equal packets are not identical to plaintiffs' institutional boxes. The Victory boxes have "Equal Sweetener" printed in all capital, black block letters on the outside whereas the Equal trademark consists of stylized lower and upper case letters of different sizes printed in blue ink. The Victory boxes do not include a trademark registration symbol or a statement as to what entity owns the trademarks, and they do not identify the source of the product.

54.     Victory resold packets of Equal that it had repackaged in the boxes to East Coast Foods
        (East Coast). East Coast was aware that Victory had repackaged the product.

55.     There is no evidence that Zack Pack's repackaging affected in any manner the quality of
        the Equal packets.

56.     When Monsanto became aware of Victory's resale of the Equal packets into the
        institutional market in the corrugated cardboard boxes, it filed this civil action and sought
        a temporary restraining order. Victory agreed to retrieve the Equal sweetener packets to
        the extent possible and hold them until a motion for preliminary injunction could be
        determined. Victory was able to retrieve approximately two-thirds of the product it had
        sold to East Coast.

57.     Victory wishes to resell the Equal packets in question to institutional food brokers or
        distributors. Victory has offered to include the following disclaimer on the shippers
        containing those packets:

        This product repackaged by Victory Wholesale Grocers (Victory is not affiliated
        with the manufacturer of this product) 400 Victory Drive, Springboro, Ohio 45066.
        Any Questions? Please call 1-800-789-9005 Ext. 350.

58.     Plaintiffs last viewed samples of the Equal product purchased from Trio at the Victory site
        in 1999. The product met plaintiffs' quality standards at that time, although some of the
        product was beginning to turn brown.

59.     Monsanto received a handful of complaints with regard to the Equal product repackaged
        by Trio. The number of complaints was not unusually large in relation to the number of
        complaints Monsanto typically receives concerning its Equal product.

60. According to individuals in the grocery wholesale/diverter business who testified at trial, counterfeit goods are very rare in the grocery business.

61. Victory did not have a standard practice of investigating a supplier before making a purchase from the supplier.

62. The practice in the wholesale grocery industry is to check containers in which the product is packed for damage on pick-up; to check the UPC to insure that the product is the product that was purchased; and to verify the quantity.

63. Victory's practice upon pick-up of a product is to check to see that the product and quantity are correct and that the product is not damaged. Victory does not normally open shipping containers of products that come to its warehouse or inspect the contents of the containers. Rather, Victory has the confidence and expectation that the product it purchases is in sellable condition.

64. Consistent with its standard practice, Victory did not open the retail cartons of Equal that it had purchased from Trio.

65. Victory intended when it purchased the Equal from Trio to sell the Equal intact as retail units.

66. In the course of its business, Victory had previously re-packed intact, unopened retail cartons of Equal into cardboard boxes for distribution and sale. That practice is not at issue in this case.

67. The practice in the wholesale/diverter grocery business is to not reveal sources for goods or customers.

## IV. Conclusions of Law

The Court must determine at this stage of the proceedings whether Victory should be enjoined from selling the Equal sweetener packets that it purchased from Trio and that it has repackaged into its own corrugated cardboard boxes. The issue of damages is not currently before the Court. The only issue before the Court at this time is the propriety of injunctive relief. The Court hereby issues the following Conclusions of Law with respect to plaintiffs' claims for injunctive relief.

## V. The Lanham Act

1. Section 32 of the Lanham Act, 15 U.S.C. § 1114, prohibits the unauthorized use of a registered trademark when selling goods using the trademark is likely to confuse or deceive consumers. *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1188 (6th Cir. 1997). Section 1114 provides, in pertinent part, that:

   (1) Any person who shall, without the consent of the registrant - -

   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods . . . on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

   shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

22

2.     The central focus of § 1114 relating to false descriptions and designations of origin is to protect the holders of registered trademarks from the promotion and sale of competing products likely to confuse consumers as to their source. ***Tanning Research Laboratories, Inc. v. Worldwide Import & Export Corp.,*** 803 F. Supp. 606, 608 (E.D. N.Y. 1992) (citing ***Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*** 799 F.2d 867, 871 (2d Cir. 1986)).

3.     A trademark is "any word, name, symbol, or device, or any combination thereof used by a person "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

4.     A "counterfeit" as defined in 15 U.S.C. § 1127 "is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." See also 15 U.S.C. § 1116(d)(1)(B)(ii).

5.     Section 43 of the Lanham Act, 15 U.S.C. § 1125, relates to false designations of origin, false descriptions, and dilution. It provides in subsection (a) that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

23

6.     Section 43(a) encompasses claims of false advertising and misrepresentation of quality and is not limited to claims of passing off a product. *Coca-Cola Co. v. Procter & Gamble Co.,* 822 F.2d 28 (6th Cir. 1987).

7.     In order to prevail on their claim for (1) infringement of trademark registration under § 32 of the Lanham Act, 15 U.S.C. § 1114, and (2) false description and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125, plaintiffs must demonstrate that defendants' use of plaintiffs' marks is "likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music,* 109 F.3d 275, 281 (6th Cir. 1997); *Monsanto Company v. Haskel Trading, Inc.,* 13 F. Supp.2d 349, 355, 355-56 (E.D.N.Y. 1998).

8.     The "likelihood of confusion" element requires the plaintiff to show that the public believes "the mark's owner sponsored or otherwise approved the use of the trademark." *U.S. Structures,* 130 F.3d at 1189.

9.     In determining whether a likelihood of confusion exists, the following eight factors may be considered: (1) strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir. 1982) (citing *AMF Inc. v. Steelcraft Boats,* 599 F.2d 341, 348 (9th Cir. 1979)).

10.    A lack of actual consumer confusion is rarely significant in determining whether the likelihood of confusion element is satisfied. *See Big Daddy's,* 109 F.3d at 284.

24

11.    Where the goods distributed by a defendant are virtually identical to the trademark owner's goods, a likelihood of confusion is established under § 1114. ***Microsoft Corp. v. Compusource Distribs., Inc.,*** 115 F. Supp.2d 800, 806 (E.D. Mich. 2000) (citing ***WSM, Inc. v. Tenn. Sales Co.,*** 709 F.2d 1084, 1086 (6th Cir. 1983)).

12.    The parties agree that the Lanham Act can be violated by a mere sale without knowledge or fault.

13.    Some courts have determined that, as a general rule, trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the trademark owner's consent. ***See, e.g., Shell Oil Company v. Commercial Petroleum, Inc.,*** 928 F.2d 104, 107 (4th Cir. 1991) (citing ***NEC Electronics v. CAL Circuit Abco,*** 810 F.2d 1506 (9th Cir. 1987)).

14.    The court in ***Shell*** went on to determine that a product is not genuine and that a Lanham Act violation occurs when the goods bearing the trademark do not meet the trademark holder's quality control standards. ***Id.*** Other courts have espoused this proposition. ***See Haskel,*** 13 F.Supp.2d at 355 (citing ***Warner-Lambert Co. v. Northside Development Corp.,*** 86 F.3d 3, 6 (2d Cir. 1996) (reasoning that the distribution of a product that does not meet the trademark holder's quality control standards "may result in the devaluation of the mark by tarnishing its image")); ***El Greco Leather Products Company, Inc. v. Shoe World, Inc.,*** 806 F.2d 392 (2d Cir. 1986).

15.    The Court in **Haskel** found that in order to prove an alleged infringer violated the Lanham Act by distributing a product that does not satisfy the trademark holder's quality control standards, the trademark holder must demonstrate that "(i) it has established legitimate, substantial and non-pretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." **Haskel,** 13 F.Supp.2d at 356 (citing **Warner-Lambert,** 86 F.3d at 6).

16.    The Court in **Shell** found that the quality control standards employed by Shell for the transportation, delivery and storage of bulk oil were necessary to maintain the quality of the oil and that those standards were an integral part of the bulk product identified by the marks; thus, in order to maintain the genuineness of the bulk oil, the quality control standards had to be maintained by Shell. 928 F.2d at 107. The Court found that by marketing the bulk oil under Shell's trademarks according to its own quality controls, defendant had violated Shell's right under the Lanham Act, 25 U.S.C. §§ 1114(1) and 1125(a), to retain control of the use of its trademark in the sale of the product to the end user. **Id.**

17. ***El Greco*** involved the distribution of shoes that had been manufactured and affixed with plaintiff's trademark prior to plaintiff's cancellation of the last two lots of its order and prior to their distribution. The shoes had been distributed without first being inspected by plaintiff even though plaintiff required a certificate of inspection prior to distribution. The Court determined that the shoes were not genuine for purposes of § 1114(1). The Court reasoned that plaintiff's certificates of inspection were an integral part of plaintiffs' effort at quality control and that plaintiff was entitled to assume that the manufacturer would not dispose of the shoes without either removing the trademark or affording plaintiff an opportunity to inspect the shoes and certify their quality prior to disposal. The Court determined that "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." ***Id.*** at 395 (citations omitted).

18. ***Haskel*** involved a counterfeiting scheme similar to that conducted by Trio. The ***Haskel*** defendants constructed counterfeit blue retail Equal cartons and repackaged packets of Equal from institutional boxes into the cartons without the plaintiffs' authorization. The court determined that by distributing the Equal product in boxes that defendants had constructed and that bore the plaintiffs' trademark, but which failed to identify the defendants' role as repackagers, the defendants had created a likelihood of confusion as to the source of the boxes.

27

19.    The defendants in *Haskel* also repackaged Equal packets from institutional boxes into clear plastic packages which contained paper inserts visible from the outside of the packages stating that the Equal had been repackaged by defendants. The court stated in a footnote that assuming the defendants had identified their role as repackagers prominently enough with respect to the plastic packages, then the repackaging of Equal into those containers did not create a likelihood of confusion as to source because defendants had thereby made the public aware that they were the source of the repackaging.

20.    Under the "first sale" or "exhaustion" doctrine, "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Tumblebus Inc. Cranmer,* 399 F.3d 754, 766 (6th Cir. 2005). The basis for the doctrine is "when a retailer merely resells a genuine, unaltered good under the trademark of the producer, the use of the producer's trademark by the reseller will not deceive or confuse the public as to the nature, qualities, and origin of the good." *Id.* (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24 cmt. b.)

21.    This Court finds as a matter of law that the Equal retail product consists of the retail cartons into which Monsanto packages the loose packets of Equal as well as the packets themselves (the Equal retail units). Plaintiffs have the right to insure that the Equal retail units meet their quality standards, that each carton contains both an accurate number of packets and the type of packets specifically designed and intended by plaintiffs for retail sale, and that each carton is packed in accordance with plaintiffs' quality control standards.

22.  Plaintiffs have proved by a preponderance of the legal evidence that they own valid
     trademarks and that the Trio retail cartons and the Equal institutional packets contained in
     those cartons constitute counterfeit goods that infringe one or more of plaintiffs'
     trademarks. Because the counterfeit cartons are virtually identical to plaintiffs' genuine
     product, the counterfeit Equal retail units create a likelihood of confusion as to the source
     of the product. Sales of the counterfeit retail Equal units therefore constitute a violation of
     the Lanham Act, 25 U.S.C. §§ 1114 and § 1125.

23.  Plaintiffs have not established by a preponderance of the legal evidence that any defendant
     named in this lawsuit was involved in the Trio counterfeit scheme.

24.  Plaintiffs have not established by a preponderance of the legal evidence that any defendant
     knew of the Trio counterfeit scheme or had reason to know of the scheme prior to
     receiving notification from Monsanto.

25.     Specifically, plaintiffs have not established by a preponderance of the legal evidence that any defendant knew or had reason to know prior to notice from Monsanto that the Equal product purchased from Trio consisted of institutional food service packets that had been repackaged into retail cartons by Trio, or that the retail cartons with the institutional packets packaged inside were counterfeit. Rather, the evidence shows that defendants first learned of the counterfeit nature of the Equal retail units sold by Trio when plaintiffs notified defendants by mail on March 26, 1999. No facet of the transactions with Trio, including the negotiations, the prices paid, and the delivery of the product, was so out of the ordinary or otherwise of such a nature as to put Victory on notice that the sales were not legitimate. Moreover, there is no evidence that defendants would have been alerted to the possibility of a counterfeit scheme by Trio had they conducted a more thorough inquiry into Trio prior to entering into any transactions with the company.

26.     Plaintiffs have not established by a preponderance of the legal evidence that defendants were willfully blind to the counterfeit nature of the Equal product purchased from Trio. Defendants' practices and procedures with respect to the purchases of Equal from Trio were consistent with the procedures they followed in other transactions and with industry practice.

27.     Although Victory was not involved in Trio's counterfeit scheme and had no reason to know that the Equal retail units it purchased from Trio were counterfeit prior to notice from Monsanto, any sale by Victory of the counterfeit Equal retail units before or after notice constitutes use in commerce of a counterfeit and a false designation of origin under § 1114(1) and § 1125(a) which is likely to cause confusion.

30

28.    Victory's pre-lawsuit sales of the institutional Equal packets that it removed from the

counterfeit cartons and repackaged in its own corrugated cardboard boxes do not

constitute infringement of plaintiffs' trademarks.  First, it is undisputed that Victory put

East Coast on notice that the Equal product was repackaged.  Thus, there was no

likelihood of confusion as to the source of the product.  Second, defendants cannot be held

liable for trademark infringement on the theory that the individual packets are not genuine

based on a failure to satisfy plaintiffs' quality control standards.  The evidence shows that

once the individual packets enter the food service market, plaintiffs lose all control over

the handling and storage of the packets and, in fact, plaintiffs had no standards for the

handling and storage of the packets by food service customers during the relevant time

frame.  Thus, defendants' repackaging operation did not deprive plaintiffs of an

opportunity that they otherwise would have had to insure that the quality of the individual

institutional packets was maintained.

### VI. The Copyright Act

1.    Title 17 U.S.C. § 106 gives the owner of a copyright the exclusive rights to take or to

authorize several actions, including the following: reproduce the copyrighted work in

copies; prepare derivative works based upon the copyrighted work; and distribute copies

of the copyrighted work to the public by sale.

2.    To establish a claim for copyright infringement, two elements must be shown: (1)

ownership of a valid copyright, and (2) copying of the constituent elements of the work

that are original. ***See Ellis v. Diffie,*** 177 F.3d 503, 506 (6th Cir. 1999) (citations omitted).

31

3.  In judicial proceedings, a certificate of registration, if made before or within five years after the first publication of the work, constitutes prima facie evidence of the validity of the copyright and the facts stated in the certificate. 17 U.S.C. § 410(c).

4.  Lack of knowledge is neither an element of the plaintiff's case nor a defense to infringement. ***Microsoft Corporation v. Compusource Distributors, Inc.,*** 115 F.Supp.2d 800, 805 (E.D. Mich. 2000).

5.  Distributing and placing upon the market without plaintiffs' authorization the Equal retail units containing direct copies of plaintiffs' Strawberry Design constitutes a violation of the Copyright Act.

6.  Plaintiffs have not established by a preponderance of the legal evidence that defendants violated the Copyright Act by repackaging institutional packets of Equal into corrugated cardboard boxes and selling the product to East Coast.

### VII. State law unfair competition claim

1.  "Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another." ***Water Management, Inc. v. Stayanchi,*** 15 Ohio St.3d 83, 85, 472 N.E.2d 715, 717 (1982) (citations omitted).

2.  Plaintiffs have failed to establish by a preponderance of the legal evidence that any defendant is liable for unfair competition under Ohio law.

## VIII. Relief

1.   Title 15 U.S.C. § 1116 provides for the granting of injunctive relief by courts vested with jurisdiction of civil actions arising under that chapter. It states, in pertinent part, that those courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsections (a), (c), or (d) of section 1125 of this title."

2.   The purpose of an injunction is to remedy and not to punish. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 62, 95 S.Ct. 2069, 2078 (1972).

3.   The use of a disclaimer has been found to be an adequate remedy when the disclaimer is sufficient to avoid substantially the risk of consumer confusion by making clear the source of the product. *See Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1315 (2d Cir. 1987) and cases cited therein.

4.   The Lanham Act, 15 U.S.C. § 1117(a), provides that a court in "exceptional cases may award reasonable attorney fees to the prevailing party." The legislative history clearly suggests that exceptional cases are those in which the infringement was malicious, fraudulent, willful, or deliberate. *Hindu Incense v. Meadows,* 692 F.2d 1048, 1051 (6th Cir. 1982) (citing S.Rep.No. 93-1400, 93d Cong., 2d Sess., reprinted in [1974] U.S. Code Cong. & Ad.News 7132, 7133).

33

5.      Defendants have not shown that plaintiffs unreasonably delayed in bringing their request for injunctive relief five to seven months after they first became aware of the Trio counterfeit scheme or that plaintiffs acquiesced in Victory's repackaging operation by their delay in bringing this action. Nor has any party established that any other party has acted in bad faith in connection with this litigation.

6.      With respect to the Equal transactions with Trio, SK Tors acted in concert with Victory.

7.      The use of a disclaimer is not an adequate remedy under the circumstances of this case. A violation of the Lanham Act and the Copyright Act occurred when Trio repackaged the loose institutional packets into counterfeit retail cartons and then sold the counterfeit Equal retail units. Once the violation occurred, plaintiffs became entitled to return of the counterfeit units.

8.      Although there is no evidence that defendants played any role in the counterfeiting scheme, considerations of equity dictate that defendants be enjoined from selling the Equal packets that were part of the counterfeit units and that the packets in defendants' possession be returned to plaintiffs.  This is an appropriate remedy because the evidence raises concerns as to whether the quality of the product has been compromised by the passage of several years since the product was originally packaged in the genuine retail cartons, and plaintiffs should not be required to bear the risk that product of an inferior quality bearing their trademarks will be sold and distributed to the public.

9.      Plaintiffs are not entitled to an award of attorney fees in connection with their request for injunctive relief.

34

10.     Whether plaintiffs are entitled to damages as a result of defendants' actions is not before

the Court in connection with the request for injunctive relief.

### IX. Order

In accordance with the foregoing, the Court **ORDERS** that defendants Brothers Trading

Company, Inc. d/b/a Victory Wholesale Grocers, Brothers Trading Co., Inc., Grapevine Trading

Co., and SK Tors, Inc., their officers, agents, servants, employees, attorneys, and all those persons

acting in concert or participation with them are **PERMANENTLY ENJOINED** from selling,

distributing, or disposing of the Equal retail units, including the boxes and contents, purchased

from Mark Siegel and/or Trio International Trading, Inc. in September 1998, November 1998,

December 1998 and January 1999, which are in their possession.  The aforesaid Equal retail units

are specifically identified as 3,072 cases of 18 cartons of 100-count Equal at $45.55 per case;

5,680 cases of 12 cartons of 50-count Equal at $16.30 per case; 1,174 cases of 18 cartons of 100-

count Equal at $45.00 per case; 4,000 cases of 18 cartons of 100-count Equal at $44.25 per case;

500 cases of 18 Cartons of 100-count Equal at $44.25 per case; and 3,327 cases of 12 cartons of

50-count Equal at $16.39 per case.

Plaintiffs' motion for writ of replevin is **DENIED.**  The defendants are **ORDERED** to

keep safe all of the aforesaid Equal retail units, including the boxes and contents, which are in their

possession until further order of the Court.

35

Plaintiffs' request for attorney fees incurred in connection with the motion for a permanent injunction is **DENIED.** Each party shall bear its own costs, attorney fees and expenses.

This case will proceed to trial on damages issues and the third-party claims.  A Scheduling Order will be issued by the Court.

**IT IS SO ORDERED.**


S/ Herman J. Weber
             HERMAN J. WEBER
SENIOR JUDGE, UNITED STATES DISTRICT COURT


J:\HJWA\99-371cprtdmkpiPUB.wpd